IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JEREMY BRUGGEMAN,

                              Plaintiff,

        vs.

KILOLO KIJAKAZI, Acting Commissioner of
Social Security;

                              Defendant.

**8:21CV304**

**MEMORANDUM AND ORDER**

        This is an action for judicial review for a final decision of the Commissioner of the

Social Security Administration ("the Commissioner"). Filing No. 1.  The claimant, Jeremy

Bruggeman, appeals the Commissioner's decision to deny his application for Social

Security Disability ("Disability") and Social Security Income ("SSI") benefits under Title II

and XVI of the Social Security Act and seeks review pursuant 42 U.S.C. § 405(g), and

1383(c)(3). *See* Filing No. 12 (Plaintiff's Motion for an Order Reversing the

Commissioner's Decision) and Filing No. 16 (Defendant's Motion for an Order Affirming

the Commissioners Decision).  A transcript of the hearing held on October 28, 2020, is

found in the record at Filing No. 9-2 at 49.  This Court has jurisdiction under 5 U.S.C. §§

702 and 706 to review the final decision.

## BACKGROUND

**I.      Procedural History**

        Mr. Bruggeman filed an application for disability and SSI on September 12, 2019,

alleging disability beginning August 31, 2019.  Filing No. 13 at 3.  Mr. Bruggeman alleged

disability due to a medically induced coma, cardiomyopathy, issues with long periods of

standing, swelling in his legs, difficulty performing activities due to increased heart rate

and becoming lightheaded and dizzy, and memory issues. *Id.* at 4–5. The administrative law judge ("ALJ") denied Mr. Bruggeman's benefits on October 28, 2020, finding he was not disabled, and the Appeals Council denied review on June 14, 2021. *Id.* at 3. Mr. Bruggeman seeks review of the final decision of the Commissioner, denying him disability benefits. Filing No. 1.

## II.    Testimony from ALJ Hearing, October 28, 2020

Mr. Bruggeman was born on June 14, 1975 and has a high school education. Filing No. 9-2 at 55. He has not been employed since August 29, 2019, when he worked at a manufacturer in the parts department. *Id.* Prior employment history involved jobs a forklift operator, material handler, logistic manager, order selector, heavy equipment maintenance and operation, chemical operator, fabricator, pipefitter, construction worker, and shipping department worker. *Id.* at 55–58.

Mr. Bruggeman testified at the ALJ hearing, that he was unable to work full-time after a hospitalization in in which he was in a medically induced coma in August of 2019 because he had to wear a device for 90 days to ensure that his heart maintained rhythm. Filing No. 9-2 at 58–59. Mr. Bruggeman testified that he is unable to work now, because of his inability to stand for long periods of time. *Id.* Standing for long periods of time makes Mr. Bruggeman's legs and feet swell, requiring him to sit down. *Id.* Mr. Bruggeman continued to testify that when he sits for long periods of time, he must elevate his legs in order to avoid swelling and promote blood circulation. *Id.* Mr. Buggerman stated that he does feel his heart race when he exerts himself, takes on more activity than his body allows him to and is walking for long periods of time. *Id.* at 60. Mr. Buggerman described a long period of time being 20 minutes or longer. *Id.*

2

Mr. Buggerman states that he cannot walk at a fast pace and only walks at a normal pace, but a normal pace for him is not a normal pace for someone who is in better shape than him. *Id.* At the time of the ALJ hearing, Mr. Buggerman had a height of 6'1", weighed 452 pounds, 32 pounds more than previously. *Id.* at 60–61. Mr. Buggerman testified to problems he has had since the increase in weight, such as, breathing, bathing, getting dressed, going to the restroom, standing, sitting, and doing activities. *Id.* at 61. Mr. Bruggeman also stated that he has been diagnosed with bipolar, depression, and mania. *Id.* Mr. Bruggeman takes medication for these mental illnesses, and his depression has contributed to his eating habits. *Id.*

Mr. Bruggeman stated that he has good days and bad days, but on the bad days he does not want to shower, does not get up and move around much, and might cry. Filing No. 9-2 at 62. Mr. Bruggeman states that he has those bad days approximately 2 days a month, that they last all day long, and he is usually left alone by himself. *Id.* at 62–63. During the ALJ hearing, Bruggeman stated, he gets a lot of help from his wife, and Cindy who works for Liberty Center and is a therapist. *Id.* at 63. Cindy calls Mr. Bruggeman approximately six times a month and made in person visits when Covid was not severe. *Id.* Mr. Bruggeman's mental health problems make it very hard for him to focus or remember certain information if his day is filled with too many tasks, and he often spaces out when someone is talking to him. *Id.* at 64. Mr. Bruggeman testified that he has a hard time completing physical tasks because of his weight and mental tasks because he gets scattered brain when given too much information, makes mistakes, gets overly frustrated and walks out. *Id.* at 65.

3

During the ALJ hearing, Bruggeman was asked how much he could safely lift, and he responded, "no more than 15 pounds" and not for very long. Filing No. 9-2 at 66. Bruggeman stated, when he lifts more than 15 pounds, his back, shoulders, and legs begin to swell up and feel like gel. *Id.* Bruggeman can stand stationary for approximately 20 minutes before he has to sit down and elevate his feet above his waist for at least 30 minutes. *Id.* at 67. Bruggeman stated, he can only sit (feet to the floor) for approximately 40 minutes, then he must elevate his feet or stand up for approximately 20-30 minutes before he can sit (feet to the floor) again. *Id.* In order to pick something up off of the floor, Bruggeman needs an item next to him to prop himself back up (i.e., bed, chair), but he does not try to get himself into that position. *Id.* at 68. Bruggeman can walk up and down stairs but must elevate his legs after due to swelling. *Id.* Bruggeman is currently not working but still must elevate his legs approximately 80 percent of the day. *Id.* at 69.

When asked about personal hygiene, Bruggeman testified he can brush his teeth on his own, some days he can shower on his own and some days he cannot, getting dressed is the hardest part since his 2019 hospitalization, and his wife helps him. *Id.* at 69. On a typical day, he will get dressed, try to clean up what he can, and move around until he needs to sit and elevate his legs. *Id.* Bruggeman drives an SUV because it is easier to get in and out of but does not go many places and avoids places that have stairs. *Id.* at 70. He was going to a physical rehab center to exercise when it was open. *Id.* He does not have many hobbies. *Id.* When hanging out with friends, they normally sit around, drink coffee, watch tv, and sometimes go golfing. *Id.* However, when golfing, he mainly rides around on the golf cart, and only participates when he can get close to the

turf without having to walk very far.  *Id.*  Bruggeman has a hard time swinging the clubs but continues to go golfing to get fresh air and be around company.  *Id.*

### III.   Medical Evidence

On November 13, 2017, Mr. Bruggeman was involved in an auto accident where he drove his father-in-law's car through two closed garage doors at a carwash.  Filing No. 10-1 at 2.  The vehicle's airbags deployed, resulting in an 8-day hospital stay where he received medical and psychiatric care.  *Id.*  Specifically, he was psychiatrically hospitalized for hyper-religious themes, symptoms of mania: "grandiose, goal-directed/high risk, decreased judgement, need for sleep, elevated mood, and pressured speech."  *Id.* at 3.  Bruggeman was referred to Shelly L. Rudloff, LIMHP for an evaluation following his in-patient stay, whom he saw on December 4, 2017.  *Id.* at 2.  At the time he was on several medications: Depakote 500 mg/day, Hydrochlorothiazide 25 mg/day, Trazadone 50 mg, Latuda 40 mg, Metprolo 25 mg, and Lisinopril 10 mg.  *Id.* at 3.  Ms. Rudloff also noted he "likes to eat and has increased his appetite since leaving the in-patient unit."  *Id.*

On January 8, 2018, Bruggeman performed a treadmill exercise test using a Bruce protocol with Dr. Joseph Citta III.  Filing No. 10-1 at 153.  The results showed that his left ventricular ejection fraction was calculated at 52%, along with several instances of premature ventricular contractions, bigeminy, and couplets during his stress test.  *Id.*

On January 30, 2019, Bruggeman had an office visit with Faith Regional Physician Services.  Filing No. 10-1 at 29.  Bruggeman's "problem list" on his chart stated: morbid obesity, obstructive sleep apnea, hypertension (benign), bilateral lower extremity, and

5

edema.  *Id.*  All of the listed problems have the same onset date of December 1, 2017. *Id.*

August 31, 2019, Bruggeman was seen by Angela M. Pruden, MD at Sunny Meadow Medical Clinic, P.C. for shortness of breath and was immediately transferred to Faith Regional Health services by ambulance for congestive heart failure.  *Id.* at 55-58. Hospital records indicate that Mr. Bruggeman was admitted for "onset of severe congestive heart failure and atrial fibrillation with rapid ventricular response, unresponsive to medicines."  Filing No. 10-1 at 74.  While in the hospital, he was examined and found to have increased echogenicity of the liver, favor hepatic steatosis, tender gallbladder, and probable extrahepatic biliary dilatation up to 14mm.  *Id.* at 135.  Daily X-rays were taken from August 31–September 6, 2019, which showed an increased prominence of the central pulmonary vasculature and increased interstitial opacities.  *Id.* at 137–53. Bruggeman's discharge records on September 8, 2019, lists diagnoses of Systolic CHF, dilated nonischemic cardiomyopathy, and status post acute kidney failure.  *Id.* at 79. Upon discharge, he was prescribed the following: amiodarone 400 mg, toprol 25 mg, Xarelto 20 mg, and KCL 20 mEq.

Bruggeman had an office visit with Jante L. Oberhauser, PA on October 10, 2019, as a follow up for his acute onset systolic heart failure.  Oberhauser stated, it "was felt that the heart failure may be secondary to an alcohol induced cardiomyopathy."  Filing No. 10-1 at 155.  At this time, Bruggeman was taking several medications: pantoprazole, amiodarone, furosemide, metoprolol, potassium chloride, rivaroxaban, and sacubitril-valsartan.  *Id.* at 160.

After Bruggeman's echocardiogram on December 9, 2019, Dr. Rome informed him that he could stop wearing his LifeVest but would still need close follow-ups with titration of medications.  Filing No. 10-1 at 183.  Dr. Rome's concluded that Bruggeman's "left ventricle is normal size with global hypokinesis and mild to moderate decreased left ventricular systolic function."  The "right ventricle is normal in size and function," left and right atria are within normal limits, no stenosis, but the "tricuspid valve shows trace regurgitation."  Id. at 194.

On January 24, 2020, Bruggeman was brought into Faith Regional Health Services under emergency protective custody for what appeared to be a manic episode.  Filing No. 10-1 at 200.  Officers had been called to perform a welfare check on Bruggeman and when found, was making several "hyper religious and grandiose statements, referring to himself as God."  Id.  Bruggeman had also entered a bridal shop where he exposed himself to the individuals inside.  Id.  When admitted, he presented with auditory hallucinations, symptoms of paranoia, not sleeping the last week, hyper fixated on religion, difficulty focusing, talking nonsensically, rapidly shifting topics during conversation, and had not been compliant with his psychotropic medications.  Id.

### IV.   Medical Opinions

Rachel Mann, APRN, opined on October 7, 2020, as Bruggeman's psychiatric medication management provider, regarding his mental impairments and their effects on his day-to-day abilities.  Filing No. 10-4 at 46.  Bruggeman had appointments with Mann every 1-3 months since February 6, 2020, for his mental bipolar 1 disorder.  Id.  Mann prescribed Bruggeman with Depakote, twice a day.  Id.  Mann addressed Bruggeman's last inpatient psychiatric stay, January 24 to February 4, 2020, stating that at the time,

although his condition was stable, it was still a severe disability. *Id.*  Mann identified Bruggeman's overall symptoms as: delusions or hallucinations, restlessness, sleep disturbance, observable psychomotor agitation or retardation, difficulty concentrating or thinking, flight of ideas, decreased need for sleep, involvement in activities that have a high probability of painful consequences that are not recognized, frequent distractibility, difficulty sustaining attention, difficulty organizing tasks, hyperactive and impulsive activity, irritability, instability of interpersonal relationships, pressure speech, preoccupation with perfectionism and orderliness, easily fatigued, muscle tension, inflated self-esteem, and distractibility. *Id.* at 47.

Mann found that Bruggeman was seriously limited in remembering work life procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention for two hour segments; maintaining regular attendance and punctuality; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; completing a normal workday/week without interruptions from psychologically based symptoms; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and responding appropriately to changes in a routine work setting. *Id.* at 48.  Mann stated that Bruggeman is unable to handle stress. *Id.* at 49.  Mann noted Bruggeman is seriously limited in interacting appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, being able to travel in unfamiliar places, and being able to use public transportation. *Id.*  Additionally, Bruggeman's psychiatric condition exacerbates his pain and physical symptoms. *Id.* at 50.  In conclusion, Mann

8

found that Bruggeman's impairment is expected to last longer than twelve months and would cause him to miss work more than four days a month. *Id.*

Eric Rome, D.O. provided a cardiac medical opinion on October 19, 2020, as Bruggeman's cardiac doctor. Filing No. 10-5 at 2. Dr. Rome saw Bruggeman every 1-5 months. *Id.* Bruggeman was diagnosed with chronic congestive systolic heart failure with a functional classification of IV, and a recent classification of II. *Id.* Dr. Rome classified Bruggeman's prognosis as fair but vulnerable. *Id.* Dr. Rome noted Bruggeman's previous clinical findings as "acute decompensated heart failure with initial echo with poor image quality showing EF 30% but subsequent heart Cath showing EF 10% and non-ischemic." *Id.* Dr. Rome wrote that Bruggeman had atrial fibrillation requiring cardioversion, and his more recent EF on June 3, 2020, showed a recovery at 55-60%. *Id.* Bruggeman's symptoms included historic arrhythmia, historic exertional dyspnea, historic exercise intolerance, historic palpitations, chronic fatigue, and peripheral edema (recent and chronic). *Id.* At the time, Dr. Rome's prescribed course of treatment was diuretic therapy and medications including Metoprolol, Xarelto, and Entresto. *Id.* at 3. Dr. Rome found that stress contributes to Bruggeman's symptoms as it puts him at "risk of medication and appointment noncompliance due to underlying mental health condition." *Id.*

Dr. Rome acknowledged that Bruggeman's physical limitations causes emotional difficulties for him such as depression and chronic. *Id.* Dr. Rome found that those emotional complications contribute to the severity of Bruggeman's symptoms and functional limitations. *Id.* These impairments are expected to last longer than twelve months. *Id.* Dr. Rome noted that Bruggeman can only walk one block without rest or severe pain, could only sit/walk/stand for two to four hours in an 8-hour working day, and

9

that he needed a job that allows for shifting positions from sitting/standing/walking.  *Id.* When Dr. Rome was asked whether Bruggeman would need to take unscheduled breaks during a workday, he responded that it was "difficult to say, [but] every two hours may be sufficient."  *Id.* at 4.  Dr. Rome wrote that Bruggeman would need to elevate his legs above his heart when sitting for a long period of time, for approximately 25-50% of the time (may vary based on symptoms).  *Id.*

When Dr. Rome was asked about Bruggeman's limitations with lifting, carrying, twisting, stooping, crouching, climbing ladders, and climbing stairs, he responded, "amounts and time frames are difficult to determine as heart failure patients' presentation may greatly vary from visits."  *Id.*  Dr. Rome remarked that Bruggeman should avoid concentrated exposure to wetness, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, and chemicals.  *Id.* at 5.  Dr. Rome stated that Bruggeman should avoid even moderate exposure to extreme cold, extreme heat, high humidity, and cigarette smoke.  *Id.*  When asked what percentage of a workday Bruggeman likely would be "off task," he responded 0-10% (may vary depending on symptoms).  *Id.*  Dr. Rome acknowledged that Bruggeman would have "good days" and "bad days" that could cause him to miss anywhere from one to over four days of work in a one month period depending on his symptoms.  *Id.*

### V.   Medical Consultant

The ALJ found the findings of the appointed medical consultant to be unpersuasive and not close enough in time to be relevant.  Filing No. 9-2 at 26.  The Court agrees.

## VI.    The ALJ's Findings

The ALJ found that Mr. Bruggeman was not disabled within the meaning of the Social Security Act from August 31, 2019, through the date of this decision.  Filing No. 9-2 at 16.  The ALJ used the five-step sequential evaluation process in determining whether an individual is disabled.  *Id.* at 17.  The ALJ found that Bruggeman had not engaged in substantial gainful activity since August 31, 2019.  *Id.* at 18.  The ALJ agreed with the findings that Bruggeman has "the following severe impairments: cardiomyopathy/acute heart failure; atrial fibrillation; lower extremity edema; hypertension; obesity; obstructive sleep apnea; and bipolar disorder."  *Id.* at 19.  The ALJ recognized Bruggeman's mental impairments and considered those with his other impairments.  *Id.*

The ALJ concluded that Bruggeman did not have an impairment or combination of impairments that met, or medically equaled, the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  *Id.*  The ALJ found that Bruggeman's heart condition did not meet the criteria of any listings in 4.00.  *Id.*  Bruggeman's heart condition did not meet the requirements listed under 4.02 for chronic heart failure because the "medical evidence does not demonstrate that the claimant's heart conditions cause "very serious" limitations in the ability to initiate, sustain, or complete activities of daily living.  *Id.* at 19.  The ALJ evaluated Bruggeman's obesity issue under SSR 19-2p.  *Id.*  "SSR 19-2p states, the functional limitations caused by obesity, alone or in combination with another impairment(s), may medically equal a listing."  *Id.*  The ALJ judge states he "fully considered obesity in the context of the overall record in making this finding."  *Id.*

The ALJ concluded that Bruggeman's mental impairments does not meet the criteria listed under 12.00 for mental disorders or listing 12.04 because "Paragraph B" criteria is not satisfied. *Id.* In order to satisfy "Paragraph B," Bruggeman's mental impairments would have to extremely limit him in functioning in broad areas. *Id.* The ALJ found Bruggeman only has a mild limitation based on his medical record and testimony from the ALJ hearing. *Id.* at 20. Bruggeman's October 2019 functional report showed his daily activities as preparing meals, helping his children with their homework, generally handling money (except the checking book), following written and spoken instructions, sometimes needing a list to remember his medications, and occasional memory loss. *Id.* Bruggeman's March 2020 function report stated, when he had memory loss, his wife would have to remind him to groom himself and take his medication, he could only prepare one simple meal a day, could not handle any money, could follow uncomplicated written instructions, but could not follow verbal instructions very well because of his lack of ability to concentrate. *Id.* Shortly before March 2020, Bruggeman was hospitalized for a maniac episode because he was non-compliant with his medication but stabilized with medication and other treatment. *Id.* Treatment notes from Bruggeman's psychiatric stay indicate he could listen intently, ask questions, had intact memory, organized through process, logical thought process, average intelligence, and the state psychological consultant assessed him at a mild limitation, not extreme. *Id.*

The ALJ found that Bruggeman only had a mild limitation when it came to interacting with other individuals. *Id.* at 21. Bruggeman testified at the ALJ hearing that he goes fishing and golfing with his friends. *Id.* Bruggeman's October 2019 function report stated he could go outside alone, drive a car, go shopping by himself for up to two

hours, golf, fish, go to church, attend bible classes, attend football games every Friday, and had zero issues getting along with individuals. Bruggeman's March 2020 function report indicated he could go outside several times a day unassisted, could go to the store for up to 40 minutes once a week, could spend time with family and friends, could go fishing, camping, driving, and golfing. *Id.* Bruggeman could interact with others regularly but did experience some issues with manic or depressed moods. *Id.*

The ALJ found that Bruggeman has a moderate limitation pertaining to his concentration levels and persisting or maintaining pace. *Id.* Bruggeman testified at the ALJ hearing stating he had trouble staying on task, paying attention when an individual was talking to him, and felt scatterbrained when presented with too much information. *Id.*

The ALJ found that Bruggeman only has a moderate limitation for adapting or managing oneself. *Id.* Bruggeman testified "that he eats to excess and cries often," and has difficulty with personal care. *Id.* Bruggeman's October 2019 function report stated, he got along well with authority figures, did not get fired for inability to get along with individuals, handled stress okay, but had trouble getting comfortable with changes in routine. *Id.* Bruggeman's March 2020 function report stated, he experienced depression, inability to function normally, was laid off from a job for inability to get along with individuals, had a hard time handling stress, had trouble getting comfortable with changes in routine, and before March 2020, had suffered a manic episode. *Id.* The ALJ recognized that written evidence showed Bruggeman had normal moods, affect and presentations when he was compliant with his medication, but at the time of his manic episode, he was not compliant. *Id.*

13

The ALJ concluded that Bruggeman did not meet two marked limitations laid out in "Paragraph B" nor any limitations laid out in "Paragraph C" that established a mental impairment. *Id.* at 22. The ALJ further determined that Bruggeman had "the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except he can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, and crawl; frequently stoop, kneel, and crouch." *Id.* The ALJ found that Bruggeman could "tolerate occasional exposure to extreme cold, extreme heat, humidity, atmospheric conditions, and hazards such as high exposed places and moving mechanical part." *Id.* The ALJ found, Bruggeman could "perform simple and routine work tasks; sustain concentration and persist at work tasks for two hours at a time with normal breaks in an 8-hour workday; perform work with few changes in routine; and occasionally interact with coworkers, supervisors, and the public." *Id.*

The ALJ recognized Bruggeman's testimony from the ALJ hearing and issues that he is currently suffering with. *Id.* at 23. The ALJ determined that Bruggeman's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Bruggeman's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* The ALJ stated, Bruggeman's cardiac condition (cardiomyopathy) is his most limiting condition but has improved since his release on September 8, 2019. *Id.* Doctor and hospitalization records after Bruggeman was released from the hospital state that he did not have any other cardiac related symptoms after being released. *Id.* at 23. The ALJ recognized Bruggeman has obstructive sleep apnea and that he uses a CPAP machine to treat his condition. *Id.* The ALJ stated, sleep

14

apnea does impact Bruggeman's "overall reduced exertional ability, stamina, endurance to perform physical activities," which all contribute to his bipolar disorder.  *Id.* at 24.  The ALJ found that, "[t]hese effects restrict the claimant from performing more than simple and routine work tasks, sustaining concentration, and persisting at work tasks for more than two hours at a time, contending with more than a few changes in routine, and interacting more than occasionally with coworkers, supervisors, and the public.  *Id.*

The ALJ acknowledges that Bruggeman is considered obese with a body mass index value in excess of 60, and that obesity can have an impact on his range of motion, ability to tolerate extreme heat, humidity or hazards.  *Id.* at 25.  The ALJ stated, "[i]n combination with the claimant's cardiac conditions and obstructive sleep apnea, it is also apparent that the claimant's obesity contributes to the limitations warranted by those conditions."  *Id.*  The ALJ again discusses Bruggeman's bipolar disorder and finds he has improved substantially while being properly medicated.  *Id.*  The ALJ discussed Bruggeman's residual functional capacity and his ability to perform daily activities.  *Id.* at 25–26.  The ALJ considered the medication that Bruggeman was taking at the time and the potential side effects of each medication and finds that the medications effectively control Bruggeman's moods.  *Id.* at 25.

The ALJ found the State agency medical consultant somewhat unpersuasive because of the early timing of the assessment.  *Id.* at 26.  The medical consultant found that Bruggeman could perform "light work with limitations by one year after the alleged onset date."  *Id.*  However, the ALJ determine that assessment was an "overestimate and inconsistent with the actual evidence developed from that period and beyond."  *Id.*  The ALJ found that Bruggeman "provides some support for his statements regarding

decreased physical activity and functioning and contributes to further limiting him to a reduced range of sedentary work." *Id.*

The ALJ found Rachel Mann, APRN, Bruggeman's psychiatric medication management provider unpersuasive. Filing No. 9-2 at 27. The ALJ recognized that Mann "endorsed extreme limitations such as inabilities to handle stress, manage money, and attend work regularly." *Id.* The ALJ found Mann's recommendation inconsistent with her reports that showed little mental health symptoms, "average intellect, on-time presentation, friendly, cooperative, and calm clinical presentation." *Id.*

The ALJ found Eric Rome, D.O., Bruggeman's cardiac doctor, somewhat persuasive. *Id.* Dr. Rome concluded that Bruggeman "could walk one block; sit, stand, and walk a total of four hours in a workday; would need to shift position at will; and would need to elevate his legs above his heart 25-to-50% of the workday depending on edema." *Id.* Dr. Rome found that Bruggeman "should avoid cold, heat, humidity, and atmospheric conditions; would be off task from 0-to-10% variably; and would be absent up to 4 days per month variably from month-to-month." *Id.* The ALJ found Dr. Rome's opinion "regarding absences and off-task behavior is unpersuasive" because he presented no evidence that supports these findings and is not familiar enough with Bruggeman to make these findings. *Id.* The ALJ also found Dr. Rome's recommendation at what degree to elevate Bruggeman's legs during a workday as unpersuasive because he failed to present evidence that supports this opinion. *Id.*

The ALJ concluded that Bruggeman could not perform any past relevant work as a "machine operator, sand laborer, heavy equipment operator, forklift operator, material handler, logistics manager, order picker, construction laborer, meat laborer." *Id.* All of

Bruggeman's prior jobs are considered substantial gainful activity that meet the requirements laid out in *Titles II & Xvi: A Disability Claimant's Capacity to Do Past Relevant Work, in Gen.*, SSR 82-62 (S.S.A. 1982). *Id.* The vocational expert testified at the ALJ hearing, Bruggeman would not be able to perform his past work based on the evidence presented. *Id.* at 28. The vocational expert testified that Bruggeman has the ability to perform the following jobs: weight tester (DOT 539.485-010, SVP 2), document preparer (DOT 249.587-018, SVP 2), and addressor (DOT 209.587-010, SVP 2). *Id.* at 29. The vocational expert made these recommendations based on Bruggeman's "age, education, work experience, and residual functional capacity." *Id.* The ALJ found that Bruggeman is not disabled, as defined in the Social Security Act, 20 C.F.R. §§ 404.1520(g) and 416.920(g), and accepts the vocational experts findings. *Id.*

## STANDARD OF REVIEW

When reviewing a Social Security Disability benefits decision, the district court does not act as a factfinder or substitute its judgment for the judgment of the ALJ or the Commissioner. *See Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995) (citing *Loving v. Dep't of Health & Hum. Servs., Sec'y*, 16 F.3d 967, 969 (8th Cir. 1994)). The court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). Substantial evidence equates to something less than a preponderance of the evidence, but more than a mere scintilla; such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003)); *Richardson*

*v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

However, this "review is more than a search of the record for evidence supporting the [Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (quoting *Hunt v. Massanari*, 250 F.3d 622, 623 (8th Cir. 2001); *Cooper v. Sec'y of Health & Hum. Servs.*, 919 F.2d 1317, 1320 (8th Cir. 1990)).   In determining whether there is substantial evidence to support the Commissioner's decision, the court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it.   *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

**DISCUSSION**

### I.   Sequential Analysis

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits.   *See* 20 C.F.R. § 404.1520(a)(4).   The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's RFC and his or her age, education, and work experience.   *Id.*   At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date.   *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998).   At step two, the claimant has the burden to prove he or she has a severe medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities.   *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013).

18

At step three, "[i]f the claimant suffers from an impairment that is listed in [20 C.F.R. § 404.1520(a)] the Listings or is equal to such a listed impairment, the claimant will be determined disabled without considering age, education, or work experience." *Flanery v. Chater*, 112 F.3d 346, 349 (8th Cir. 1997); *see also Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984). "The Listings" stipulate the criteria for each impairment that is considered presumptively disabling.  20 C.F.R. Part 404, Subpart P, App. 1 § 11.03.  If the claimant does not meet the listing requirements, the ALJ will instead determine the claimant's residual function capacity (RFC), which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4).

A claimant's residual functional capacity ("RFC") is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545(a).  The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical history, opinions of treating physicians and specialty physicians, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015).  "The RFC must (1) give appropriate consideration to all of [the claimant's] impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting." *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) (quoting *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work.  *Cuthrell*, 702 F.3d at 1116.  If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age,

education, and work experience, that there are other jobs in the national economy that the claimant can perform.  *See Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (citing *Reed v. Sullivan*, 988 F.2d 812, 815–16 (8th Cir. 1993)).

## II.   Treating Physician

"The ALJ must give 'controlling weight' to a treating physician's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'"  *Papesh*, 786 F.3d at 1132 (quoting *Wagner v. Astrue*, 499 F.3d 842, 848–49 (8th Cir. 2007).  Even if not entitled to controlling weight, a treating physician's opinion "should not ordinarily be disregarded and is entitled to substantial weight."  *Papesh*, 786 F.3d at 1132 (quoting *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007).  The regulatory framework requires the ALJ to evaluate a testing source's opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source.  *See* 20 C.F.R. § 404.1527(c)(2).  "When an ALJ discounts a treating physician's opinion, the ALJ should give 'good reasons' for doing so."  *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)).

Recently, the Social Security Administration amended and reorganized the regulations and 20 C.F.R. §§ 404.1527 and 416.927 have been superseded by 20 C.F.R. §§ 404.1520c and 416.920c for claims filed after March 27, 2017.  *See Seay v. Berryhill*, No. 5:16-CV-05096-VLD, 2018 WL 1513683, at *39 (D.S.D. Mar. 27, 2018).  According to new Social Security Administration rules effective March 27, 2017, the ALJ need not

grant any medical opinion controlling weight, regardless of whether the opinion comes from a treating, examining, or consulting physician. 20 C.F.R. § 404.1520c.  Instead, the ALJ must evaluate medical opinions according to 5 factors: (1) Supportability, (2) Consistency, (3) Relationship to the claimant, which includes (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization, and (5) other factors. *Id.*  According to the rule, supportability and consistency are the most important factors and must be addressed by the ALJ in his or her decision. *Id.*  Thus, while the new rules do not dictate the weight the ALJ is to ascribe to any given medical opinion, the ALJ is required to explain why she finds a medical opinion to be persuasive or not. *Dornbach v. Saul*, No. 4:20-CV-36 RLW, 2021 WL 1123573, at *3 (E.D. Mo. Mar. 24, 2021).  Therefore, the old standard that "when an ALJ discounts a treating [source's] opinion, she should give good reasons for doing so," still applies. *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).[1]

This Court finds that the ALJ erred in affording little and, at times, no weight to the opinion of Dr. Rome, Bruggeman's treating cardiac physician, and Rachel Mann APRN, Bruggeman's psychiatric medication management provider. Filing No. 9-2 at 27.  The ALJ found Dr. Rome's opinion regarding absences and off-task behavior unpersuasive, and his recommendation at what degree to elevate Bruggeman's legs during a workday unpersuasive because he failed to present evidence that supported these opinions. *Id.* at 27.  The ALJ determined that Mann's mental medical opinion that "endorsed extreme

---

[1] This Court reserves judgment on how the new rules interact with long held case law precedent outlining the substantial weight due to the medical opinions of treating physicians, as the result would be the same in this case no matter which rules apply. *See Papesh*, 786 F.3d at 1133.

limitations such as inabilities to handle stress, manage money, and attend work regularly"
was unpersuasive because her findings were inconsistent with her reports. *Id.*

This Court finds that opinions of Dr. Rome, coupled with those of Mann, APRN,
overwhelmingly support Bruggeman's claim of disability.  Dr. Rome clearly expressed his
opinions, including Bruggeman's need to elevate his legs.  The ALJ found this not to be
credible.  However, the Court finds this statement by the ALJ not to be supported by any
evidence.  The ALJ is not a doctor.  The evidence in the record, in conjunction with Dr.
Rome's statement, is substantial evidence in this regard.   The evidence overwhelmingly
supports a finding that Bruggeman has significant heart and heart-related issues.

Bruggeman was hospitalized a number of times related to his mental health.   He
was diagnosed as bipolar as early as 2012.   He had manic episodes including failure to
wear his clothes in public during the time in question.  Although the ALJ discounted the
opinions of Mann, APRN, noting that there were some improvements in Bruggeman's
mental health that only worsened when he fails to take his medications, the Court realizes
that that is the nature of mental illness, and that occasional forgetfulness or willfully not
taking medication is to be expected.

The record clearly supports a finding that the treating physicians' evidence and
records support a finding of disability and inability to work.   The ALJ's decision in that
regard is not supported by the evidence, and the findings of the onetime administration
consultant clearly are not supported by the evidence.

## III.    Credibility

In determining whether to fully credit a claimant's subjective complaints of disabling
pain, the Commissioner engages in a two-step process: (1) first, the ALJ considers if there

is an underlying impairment that could reasonably produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit" the claimant's ability to work.  Soc. Sec. Rul. 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, Social Security Ruling 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01.  In the second step of the analysis, in recognition of the fact that "some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence[,]" an ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  Id. at 14168.

To determine the intensity and persistence of an individual's symptoms, the ALJ evaluates objective medical evidence, but "will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled."  Id.  However, the ALJ must "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."  Id. at 14169.  If an ALJ cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then he or she must carefully consider other evidence in the record – including "statements from the individual, medical sources, and any other

sources that might have information about the individual's symptoms, including agency personnel, as well as the factors[2] set forth in [the Social Security] regulations" – in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms.  *Id.*

> Social Security Ruling 16-3p also provides:
>
> We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect that ability to perform work-related activities for an adult or the ability to function independently, appropriately, and effectively . . .. Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

*Id.* at 14170.  "[The Eighth Circuit Court of Appeals] has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."  *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) (citing *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998)).  Subjective allegations of disabling pain can be discredited if the claimant has only occasionally followed medical treatment or taken prescribed medications.  *Singh*, 222 F.3d at 453; *see Guilliams v. Barnhart*, 393

---

[2] Those factors include:

> "1) Daily activities; 2) The location, duration, frequency, and intensity of pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) Any other factors concerning an individual's function limitations and restrictions due to pain or other symptoms."

81 FR at 14169-70.

F.3d 798, 801 (8th Cir. 2005) (stating, "A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole.").

The ALJ correctly found that Bruggeman's medically determinable impairments—cardiomyopathy, obesity, and sleep-related breathing disorders—could reasonably cause the alleged symptoms.  Filing No. 9-2 at 23.  The ALJ erred in finding that Bruggeman's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. at 23.  The ALJ found that Bruggeman's cardiac condition (cardiomyopathy) is his most limiting condition that has improved since his release on September 8, 2019.  Id. at 23. However, ti is clear that the heart conditions, as stated herein, are significant impairments.

Further, the mental health issues set forth cannot be discounted.  Bruggeman has significant mental health issues that fluctuate with intensity.  His medications help his condition, however, the combination of his mental and physical conditions along with his obesity clearly show symptoms that overwhelmingly support a finding that he is disabled. His significant complaints of pain and inability to do consistent everyday tasks, are entirely credible.   The ALJ erred in this regard.

## IV.   Vocational Expert's Testimony

In the fourth step of the sequential analysis, the ALJ considers whether a claimant's impairments keep him from doing past relevant work.  20 C.F.R. § 404.1520(e). A claimant's RFC is the most that one can do despite his or her limitations.  20 C.F.R. § 404.1545(a)(1).  The claimant is not disabled if the claimant retains the RFC to perform: "1.  The actual functional demands and job duties of a particular past relevant job; or 2. The functional demands and job duties of the occupation as generally required by

employers throughout the national economy." *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996) (quoting Soc. Sec. Ruling 82-61).   During this step, an ALJ may consider the vocational expert's testimony when determining the claimant's RFC.   *Wagner*, 499 F.3d at 853–54.   The ALJ often asks the vocational expert a hypothetical question to help determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant.   *Guilliams*, 393 F.3d at 804.

The Court first finds that the vocational expert failed to understand the conflict between his testimony (as to what jobs were available) and the Dictionary of Occupational Titles regarding the reasoning level limitations set forth in the ALJ's hypothetical question. *See* TR 73-74, ECF No. 9-2 at 74-75.   Such error leaves only one job that Bruggeman is capable of performing, an "addressor job."   Further, when asked about the elevation of his legs each day, the VE testified that "those jobs would not be possible."   *Id.*   The overwhelming evidence presented in terms of both Bruggeman's mental and physical disabilities leads the Court to conclude that he is disabled and unable to work.   The ALJ has failed to present substantial evidence that Bruggeman is able to do any significant work in the economy, as an "addressor" or any other job.

## CONCLUSION

The clear weight of the evidence points to a conclusion that Mr. Bruggeman has been disabled since August 31, 2019.   "Where further hearings would merely delay a receipt of benefits, an order granting benefits is appropriate."   *Hutsell v. Massanari*, 259 F.3d 707, 714 (8th Cir. 2001) (quoting *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984).   Accordingly,

IT IS ORDERED:

1. Plaintiff's motion to reverse the commissioner's decision (Filing No. 12) is granted;

2. Defendant's motion to affirm the commissioner's decision (Filing No. 16) is denied;

3. The decision of the Commissioner is reversed;

4. This action is remanded to the Social Security Administration for an award of benefits; and

5. A judgment will be entered in accordance with this memorandum and order.

       Dated this 22nd day of June 2022.

                                  BY THE COURT:

                                  s/ Joseph F. Bataillon
                                  Senior United States District Judge